## Case No. 9,266.

### The MASTEN.

[1 Brown's Adm. 436.] [1]

District Court, E. D. Michigan. June, 1872.

COLLISION—WEIGHT OF EVIDENCE—SPEED IN ENTERING A HARBOR.

1. Evidence of verbal statements made in time of excitement and peril should be received with great caution, and when opposed to the direct and concurring testimony of many witnesses, is entitled to but little weight.

2. A sailing vessel entering a crowded harbor at the rate of six miles an hour, in addition to a favorable current of four miles, condemned for too great speed.

Libel for collision by Frederick H. Blood, owner of the schooner Maid of the Mist.

The collision occurred at about 2 o'clock in the morning of the 10th day of September, 1871, in the St. Clair river, a short distance below Port Huron, and opposite the Port Huron Middle Ground, so called. The schooner was lying at anchor, in about mid-channel, and the bark was coming down the river, bound on a voyage from Chicago to Buffalo, laden with wheat. The starboard bow of the bark struck the schooner on the starboard side, carrying away her jibboom and head gear, and her foremast head, breaking her starboard stanchions, and driving her anchor into her, and inflicted such injuries that she sunk in about an hour and a half. The night was dark, although it was a good night to see lights. There was a large number of vessels at anchor in the river, variously estimated by the witnesses at from thirty to seventy or eighty. The channel was somewhat narrow, although there was ample room for vessels exercising ordinary care and skill to pass. The wind was blowing a stiff breeze down the river, and was consequently free to the bark. The current at that point was about four miles an hour. The bark had up her mainsail, mainstaysail, topsail, and three jibs, and was running at the rate of about six miles an hour through the water, and about ten miles by the land. Her mainsail was being taken in at the time of the collision. Thus far the facts were undisputed.

H. B. Brown, for libellant. The master was clearly in fault for running at too great speed. The following facts are not disputed:

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

First. That the wind was blowing almost a gale from the northerly, and was a fair wind for the Masten as she came down the river. Second. That she was passing through the water at six miles an hour. Third. That, with the addition of the current, she was actually approaching the schooner at ten miles an hour. Fourth. That no sails had been furled from the time she entered the river, and only a reef taken in her topsails. Fifth. That there were from fifty to eighty sail in the river, that had taken refuge there from a storm in the lake. These vessels were lying upon both sides and in the center of the river. It was the duty of the bark to furl all her canvas, except what was absolutely necessary to preserve her steerage way, or to come to anchor before she reached the schooner. The Morning Light, 2 Wall. [69 U. S.] 550, 558; The Virgil, 2 W. Rob. Adm. 202.

W. A. Moore, for claimant.

Mr. Moore's brief discusses simply the question of fact.

LONGYEAR, District Judge. The main and only disputed essential fact in the case is, whether the schooner had up her proper anchor light; and it is conceded that if she had, then the bark is in fault, and must respond in damages. Too great speed is also charged as a fault against the bark; but this can be of importance only in case it shall be found that the schooner had not up her proper light, and then only on a question of division of damages. The question as to the schooner's light will, therefore, be first considered.

The testimony on the part of the libellant shows that from the force of the wind and current the schooner dragged her anchor a considerable distance before she came to, and that she came to only a few minutes—fifteen or twenty—before the collision. John Jones, master of the schooner, testifies that immediately upon coming to anchor, he took in the colored lights, and hung a bright light in the fore-rigging on the port side. He then describes the lamp or lantern, and its height from the deck, &c., but as no question is made in these respects, it is unnecessary to repeat his testimony. Hannah Dell, the cook, testifies that she trimmed the bright light, and handed it to Capt. Jones, in the cabin, when he brought in the colored lights. James M. Jones, son of Capt. Jones, and who was on the lookout on the schooner, testifies that he saw his father hang up the light, and that it burned brightly. Oscar Hill testifies that he was on deck several minutes after the schoner came to anchor, and that he distinctly saw the light; that he went below before the collision, but on hearing the alarm, came on deck, and at the time of the collision was standing near the fore-rigging; that when the foremast head was carried away, the fore-rigging came down with a run and the lamp with it, that the lamp hit him on his back, and that it was then still burning. Henry Sageman testifies that he was also on deck when the schooner came to anchor, and saw the light hung in the rigging, and that it was burning good.

Now these five witnesses testify with a particularity of detail which precludes the possibility of their being mistaken. One of two things must be true, either that the schooner had a proper and sufficient anchor light, or that each of these five witnesses has sworn falsely, willfully and deliberately.

In answer to this array of testimony, respondent produces the following: James Kendrick, master of the bark, testified that he was standing forward near the lookout, when the latter reported to him that he saw a vessel ahead; that by the aid of his glass he distinctly saw a vessel, which proved to be the Maid of the Mist, a little over his starboard bow, and only about 100 feet off, and that he saw no light on her; that he immediately ordered his wheel hard a-starboard, and the collision occurred almost immediately after. He also testifies to a conversation with Capt. Jones, master of the schooner, in which he said to the latter, that it would not have happened, if he, Capt. Jones, had had a light out, and that Capt. Jones replied that he ordered the boys to put one out. Two others of the crew of the bark testify to having heard Capt. Jones make the same statement. George Johnson, the lookout on the bark, testified to seeing the schooner, and reporting her to Capt. Kendrick, and that he saw no light on her. The wheelsman on duty, and several others of the crew of the bark, on deck at the time, also testify that they saw no light on the schooner before the collision, but it does not appear that any of them saw the schooner, and I am satisfied they were not in a position to have seen her, or any light there may have been upon her at any time before the collision occurred. All the witnesses on the part of the bark testify that the first light they saw on the schooner was a light coming out of her cabin soon after the collision.

Besides the above testimony on the part of respondents, a statement made by Hannah Dell, the cook on the schooner, in her testimony, to the effect that when the lamp was brought into the cabin after the collision, it was burning dimly and the glass was smoky, is alluded to as evidence that even if a light was out, as testified by the witnesses on the part of the schooner, it was not a sufficient one.

I shall take up and consider the points involved in respondents' testimony in the inverse order in which they are above stated. The condition of the light when it was brought into the cabin after the collision, as stated by the cook, is easily attributable to what happened to it by the collision, and

therefore does not necessarily conflict with the statements of the witnesses on the part of the schooner, that it was burning brightly before the collision. The only thing that appears strange to me is that it was not extinguished entirely. The fact that those on board the bark did not see the light immediately after the collision is, in my opinion, to be attributed to the fact that it came down with the rigging, and was thereby hidden from their view.

The statement sworn to by Capt. Kendrick and two other witnesses on the part of respondents, as having been made by Capt. Jones, that he told the boys to hang out a light on the schooner, is attempted to be explained by Capt. Jones. He says that after the collision he did tell the boys to hang out the light again, and that although he has no recollection of making the statement testified to by Capt. Kendrick and the others, yet if he did make it, it must have been made in reference to that circumstance. Besides this, testimony of verbal statements made and heard in time of excitement and peril must be received with much caution, and when opposed to the direct and positive concurring testimony of many witnesses can have but little weight. If the fact of light or no light rested on Capt. Jones' uncorroborated testimony, then the statement might have considerable force; and perhaps in the light of the testimony of Capt. Kendrick and the lookout on the bark, that they saw no light on the schooner, it would outweigh Capt. Jones' testimony entirely. But Capt. Jones is fully corroborated by the testimony of three eye-witnesses as to the fact of the light being there in its proper position in the rigging, and these witnesses stand perfectly fair before the court. Capt. Jones' testimony may be thrown entirely out of the case, and still there is ample proof that the light was there, by whomsoever it may have been placed there.

There is more force, however, in the statements of Capt. Kendrick, of the bark, and his lookout, that they saw no light on the schooner. It was their business to look for lights, and it is a fair and even strong presumption that there was no light where they saw none. After all, it is a presumption merely, and cannot have the effect in this case, of outweighing satisfactory positive proof of the existence of the fact itself, viz., that there was a light. Capt. Kendrick and the lookout, in making their statement that they saw no light, do not stand in the same position of Capt. Jones and his men in their statement that there was a light. The latter could not be mistaken, while the former might be. The alternative presented in the case of the witnesses for libellant is not presented here. There may have been a light on the schooner, as testified by libellant's witnesses, and still it may be true that Capt. Kendrick and his lookout did not see it, as testified by them.

Why they did not see it is not necessary for us to inquire. It is sufficient for our present inquiry that there is a strong preponderance of proof that the schooner had a proper and sufficient anchor light.

That it was the legal duty of the bark to avoid the schooner under the circumstances found to exist is, of course, conceded. Not having done so the bark was in fault, and must respond for the schooner's damages.

Having arrived at the above conclusion, it is unnecessary to consider the question of speed. But I deem it a duty, as a caution to navigators, to express the disapprobation of the court of the almost reckless speed of the bark under the circumstances. Capt. Kendrick testified that the bark was quick to mind her helm, and it is preposterous to say that a speed of six miles an hour through the water was necessary for steerage way, when beyond all question one-half that speed, or even less, was amply sufficient for the purpose. Here was a large vessel, heavily laden, coming down the current and before a strong wind, in a comparatively narrow channel in which were numerous vessels at anchor, carrying canvas sufficient for the open water in such a breeze, and rushing along at a speed entirely unnecessary for her management, and which, under the circumstances, seemed entirely regardless of danger to herself or to other vessels. It was clearly her duty, on coming into the river, to have taken in her canvas until her speed had been slackened down to just what was absolutely necessary for steerage-way. The excessive speed of the bark was a gross fault, and one for which she must have been held responsible in any event. Decree for libellant.